# EXHIBIT A

| | |
|---|---|
| DISTRICT COURT, JEFFERSON COUNTY, COLORADO<br>Jefferson Combined Court<br>100 Jefferson County Parkway<br>Golden, CO 80401 | DATE FILED: December 1, 2020 11:35 AM<br>FILING ID: D870B431E3FAF<br>CASE NUMBER: 2020CV31444 |
| **LAUREN SIEWERT,**<br>Plaintiff<br><br>v.<br><br>**DEVEREUX CLEO WALLACE d/b/a DEVEREUX ADVANCED BEHAVIORAL HEALTH COLORADO, THE DEVEREUX FOUNDATION d/b/a DEVEREUX TEXAS TREATMENT NETWORK, and THE DEVEREUX FOUNDATION d/b/a DEVEREUX ADVANCED BEHAVIORAL HEALTH,**<br>Defendants. | ♦ COURT USE ONLY ♦ |
| Attorneys for Plaintiff:<br>Mary Jo Lowrey, No. 40411<br>Sara N. Maeglin, No. 49943<br>Lowrey Parady Lebsack, LLC<br>1490 Lafayette Street, Suite 304<br>Denver, CO 80218<br>Phone: (303) 593-2595<br>MaryJo@lowrey-parady.com<br>sm@lowrey-parady.com | CASE NO:<br>DIVISION: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff, Lauren Siewert (Plaintiff or "Ms. Siewert"), by and through her counsel, complains against Defendant Devereux Cleo Wallace d/b/a Devereux Advanced Behavioral Health Colorado ("Devereux Cleo Wallace"), The Devereux Foundation d/b/a Devereux Texas Treatment Network ("Devereux Foundation Texas"), and The Devereux Foundation d/b/a Devereux Advanced Behavioral Health ("Devereux Advanced Behavioral Health") (together "Defendants") as follows:

1

# INTRODUCTION

1. Defendants specialize in the treatment of children and adolescents with severe psychological, behavioral, and emotional issues. Despite knowing that their patients sometimes have violent, sexually-inappropriate outbursts, Defendants failed to implement minimum safeguards to protect its employees from potentially dangerous situations. These failures resulted in the violent sexual assault of their employee Plaintiff Lauren Siewert by one of her patients.

2. Defendants failed to equip their facilities with robust safety features to protect patients and staff. Instead, Defendants' residential location in Westminster, Colorado had office doors that automatically locked when closed, creating an increased risk that staff could be trapped in offices and caused harm. In fact, on December 12, 2018, a teenage boy closed Ms. Siewert's office door, trapping them together in her office while he forcibly pushed her to the ground and began to strangle her. Then, in an attempt to rape her, he yanked down her dress, violently grabbed her breasts, and tried to tear her tights to penetrate her vagina.

3. While Ms. Siewert was being attacked, valuable time passed as her colleagues attempted to, but could not, enter her office because her door was locked and they were without a key. Eventually staff members rescued Ms. Siewert and detained the patient.

4. Additionally, Defendants put Ms. Siewert at an increased risk when they failed to create and implement a policy that ensured Ms. Siewert knew about her patient's past and increasing sexual aggression. Even though Defendants knew that her patient was exhibiting sexually inappropriate and aggressive behavior days before the attack, Ms. Siewert was not informed about his escalating, sexually-aggressive behavior. Without adequate knowledge about the risks associated with her patient, Ms. Siewert met with her patient alone and without special precautions, creating a situation ripe for assault.

5. After the attack, Defendants could have used what happened to Ms. Siewert as an opportunity for change. However, Defendants belittled and blamed Ms. Siewert for the attack, failed to address her serious trauma, and refused to make immediate adjustments to its building and policies to prevent future assaults on the premises.

6. On December 5, 2019, Ms. Siewert constructively discharged her employment because she continued to experience emotional distress resulting from the assault, Defendants' inadequate response, and repeated harassment by her coworkers.

7. Based on Defendants' action and inaction, Ms. Siewert brings claims for negligence, violation of the Premises Liability Act, C.R.S. § 13-21-115, and for a sexually hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*

## PARTIES

8. Plaintiff Lauren Siewert is a resident of, and domiciled in, Colorado. She resides in Fort Collins, Colorado.

9. Defendant Devereux Cleo Wallace is a Colorado not-for-profit corporation with a principal place of business at 8405 Church Ranch Boulevard, Westminster, Colorado 80021.

10. Defendant Devereux Cleo Wallace owns and operates the property located at 8405 Church Ranch Boulevard, Westminster, Colorado 80021.

11. Upon information and belief, Defendant Devereux Advanced Behavioral Health, a Pennsylvania not-for-profit corporation, owns and operates Defendant Devereux Cleo Wallace.

12. Upon information and belief, Defendant Devereux Foundation Texas, a Texas not-for-profit corporation, also owns and operates Defendant Devereux Cleo Wallace.

13. All Defendants own and operate centers that provide severe psychiatric, emotional, and behavioral treatment for children and adolescents.

14. At all relevant times, Defendants were employers within the meaning of Title VII.

15. At all relevant times, Ms. Siewert was an employee of Defendants within the meaning of Title VII.

16. Defendants employed Ms. Siewert as a Psychiatric Physician Assistant from July 24, 2018 to December 5, 2019 at their outpatient location in the Cherry Creek neighborhood of Denver, Colorado ("Cherry Creek location") and at their residential location in Westminster, Colorado ("Westminster location").

## JURISDICTION AND VENUE

17. The Court has jurisdiction over this case under Colo. Const. Art. 6 § 9 and C.R.S. § 13-1-124(1)(b).

18. Under C.R.C.P. 98(c), venue is proper in Jefferson County because the events described herein took place at Defendant Devereux Cleo Wallace's principal office, which is located in Jefferson County.

## JURISDICTIONAL PREREQUISITES

19. On October 7, 2019, Ms. Siewert filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendants for claims of a sexually hostile work environment, race discrimination, and retaliation. Her Charge of Discrimination was assigned EEOC Charge No. 541-2020-00068.

20. On August 3, 2020, Ms. Siewert filed her second Charge of Discrimination with the EEOC against Defendants for claims of a sexually hostile work environment and retaliation leading to her constructive discharge. Her second Charge of Discrimination was assigned EEOC Charge No. 541-2020-02897.

21. On September 4, 2020, the EEOC sent Ms. Siewert a Notice of Right to Sue on EEOC Charge No. 541-2020-00068.

22. On September 25, 2020, the EEOC sent Ms. Siewert a Notice of Right to Sue on EEOC Charge No. 541-2020-02897.

23. Ms. Siewert has administratively exhausted her Title VII claims against Defendant under 42 U.S.C. § 2000e *et seq.*

## GENERAL ALLEGATIONS

24. According to their own accounts, Defendants specializes in the treatment of children and adolescents with severe psychological, behavioral, and emotional issues.

25. Upon information and belief, Devereux Advanced Behavioral Health and Devereux Foundation Texas own treatment facilities across the country, including Devereux Cleo Wallace in Colorado.

26. Starting on July 24, 2018, Defendants employed Ms. Siewert as a Psychiatric Physician Assistant.

27. As a Psychiatric Physician Assistant, Ms. Siewert's primary job duties included meetings with patients to review their medications and track their treatment progress.

28. Ms. Siewert split her time between two Devereux Cleo Wallace facilities. She spent Mondays, Tuesdays, and Thursdays in the outpatient facility at the Cherry Creek location, and Wednesdays and Fridays with residential clients at the Westminster location.

29. At the Westminster location, Defendants assigned Ms. Siewert to the Oak unit, a residential unit where boys between 14 and 18 years old received treatment, schooling, and vocational training.

**Defendants failed to ensure the safety of their staff.**

30. The Westminster location included offices with doors that automatically locked.

31. Offices in the Westminster location were not equipped with emergency buttons or any other warning device staff could use to alert security or the police about a dangerous situation.

32. Defendants did not require or encourage all employees who met with patients in their offices to carry a two-way radio, even though some of their patients were known to be aggressive or violent.

33. Ms. Siewert was specifically told she did not need to carry a two-way radio.

34. Defendants did not train Ms. Siewert on how to use two-way radios.

35. Defendants de-emphasized to Ms. Siewert the risks of her employment, such as telling her in the restraint training that she was not going to need to use what she learned.

5

36. Defendants inconsistently assigned dedicated direct care staff to escort aggressive or violent patients to clinical appointments.

**Defendants did not tell Ms. Siewert that one of her patients was sexually aggressive, nor did Defendants tailor safety protocol to that patient's needs.**

37. One of Ms. Siewert's patients was a six-foot, over two-hundred pound, 17-year-old boy ("the Patient").

38. Before he transferred to the Westminster location, the Patient lived at one of Defendants' centers in Florida ("Florida Center") for approximately four years.

39. Upon information and belief, the Florida Center knew or should have known about the Patient's sexually aggressive behavior and should have documented this behavior in his file.

40. Upon information and belief, when the Florida Center transferred the Patient to the Westminster location, it intentionally underrepresented the patient's sexually aggressive past.

41. In fact, the Westminster location received a file from the Florida Center that emphasized the Patient's impulsivity and behavioral problems, but provided only one example of the Patient's sexual aggression, and that was from when the Patient was in the third grade and made "sexualized comments."

42. After reviewing the Florida Center's file on the Patient, Ms. Siewert did not know that the Patient was sexually aggressive.

43. Defendants also knew that the Patient was sexually aggressive based on his conduct at the Westminster location.

44. Days before Ms. Siewert's assault, the Patient's aggressive behavior began to escalate. Staff had to physically restrain the Patient multiple times.

45. Two days before Ms. Siewert's assault, the Patient chased three female staff members around a room, eventually catching one of them and rubbing his penis against her leg.

46. One day before Ms. Siewert's assault, Defendants knew of the Patient's threats that he intended to "do something really bad and go to prison" and that "white bitches were [his] trigger."

47. The Patient's counselor, Melissa Freeman, along with other female staff members, requested that Defendants implement security measures around the Patient. Defendants, through its Clinical Director Lisa Gaudia, rejected their request.

48. Defendants did not warn Ms. Siewert about the Patient's increasing sexual aggression prior to her appointment with the Patient on December 12, 2018.

49. Upon information and belief, Defendants did not assign the Patient any restrictions based on his increasing sexually aggressive conduct.

### On December 12, 2018, the Patient physically and sexually assaulted Ms. Siewert ("December Attack").

50. On December 12, 2018, Ms. Siewert had an appointment with the Patient.

51. Prior to her session, Ms. Siewert was told that the Patient had been "escalating" in response to limits.

52. Ms. Siewert had also received routine emails describing the Patient acting out.

53. The emails about the Patient did not indicate that he was being sexually inappropriate with staff.

54. Based on what she was told about the Patient, Ms. Siewert only believed the Patient might become verbally aggressive with her.

55. In an abundance of caution, Ms. Siewert asked her office neighbor, Sharon Juarez-Garcia, to remain in her office during her appointment with the Patient.

56. Ms. Siewert also requested a two-way radio from Josh Mikalski in IT.

57. Despite the precautions initiated by Ms. Siewert, the Patient attacked Ms. Siewert as they concluded their appointment.

58. Specifically, the Patient closed the door ahead of Ms. Siewert, trapping her in the office because the Westminster location's doors automatically locked when closed. He then grabbed

7

and threw her two-way radio away from her, and shoved her to the ground, slamming her face on a chair on the way down. Next, he pinned her to the ground in front of the door and began to strangle her. Finally, he yanked down her dress and tried to pull down her tights while grabbing and fondling her breasts.

59. Staff members attempted to respond to Ms. Siewert's cries for help, but struggled to find a key to unlock her door. Minutes later, staff unlocked her door, entered her office, and prevented a penetrative rape.

60. The police were called. When they arrived, they arrested the Patient and removed him from the Westminster location.

**Defendants retaliated against Ms. Siewert for the December Attack and for complaining about additional offensive conduct.**

61. Defendants created a hostile work environment against Ms. Siewert due to the December Attack.

62. Soon after the attack, Ms. Siewert requested a five-day outpatient rotation at the Cherry Creek location. An outpatient rotation would give her time away from the Westminster location where she had been assaulted.

63. Instead, Defendants assigned Ms. Siewert to the Maple unit, a residential unit where girls between 14 and 18 years old received treatment, schooling, and vocational training. The Maple unit was located within the Westminster location.

64. In doing so, Defendants placed Ms. Siewert in an unsustainable placement.

65. Ms. Siewert's schedule at the Cherry Creek location conflicted with the Maple unit's Treatment Plan Review and Team Meetings, forcing her to prescribe medication to patients without the beneficial input and feedback of the care team.

66. Out of concern for patient safety, Ms. Siewert felt she had no choice but to transfer back to the Oak unit in February 2019. Back in the Oak unit, she would be able to attend her patients' Treatment Plan Review and Team Meetings.

67. In addition to placing her in the Maple unit, Defendants tolerated its staff's trivialization of Ms. Siewert's attack.

68. Dr. Patrick Bacon, Ms. Siewert's direct supervisor, told Ms. Siewert that "it actually takes a very long time to kill someone by strangling them."

69. Another staff member, Megan Daveline, told Ms. Siewert that when she was punched in the face by a patient, she did not press charges, and instead drank a margarita.

70. Moreover, Defendants blamed Ms. Siewert for the attack.

71. When Ms. Siewert spoke with Care Coordinator Justin Protentis about stopping a different patient's medication months after her attack, he commented: "I don't know if you remember what happened the last time you stopped someone's medication."

72. Ms. Siewert immediately reported Mr. Protentis' comment to Kim Farestad and Allison Wheeler.

73. Ms. Siewert does not know if Ms. Farestad or Ms. Wheeler spoke with Mr. Protentis or disciplined him for his comment.

74. Moreover, Defendants' employees callously talked with Ms. Siewert on multiple occasions about readmitting the Patient to the Westminster location. Ms. Siewert always expressed her opinion that the Patient should not be readmitted to the Westminster location.

**For many months after the December Attack, Defendants failed to correct its safety policies and procedures and the unsafe conditions present at the Westminster location.**

75. Defendants refused to implement changes based on Ms. Siewert's attack; and only made necessary changes when it would cost them more money not to make changes.

76. For example, Defendants continued to operate without any restrictions regarding meetings between female staff and sexually aggressive patients until another female employee was sexually assaulted in March 2019.

9

77. And Defendants only replaced its automatic-locking door knobs in April 2019 in anticipation of an upcoming Joint Commission visit. The Joint Commission is an independent body that certifies mental health facilities, hospitals, nursing homes, and other healthcare facilities.

### Defendants gave Ms. Siewert no choice but to constructively discharge on December 3, 2019.

78. After Defendants failed to protect Ms. Siewert from a physical and sexual assault, she developed significant anxiety, depression, and difficulty sleeping that worsened as her employer retaliated against her and failed to improve its safety protocols.

79. To protect her physical and emotional wellbeing, Ms. Siewert had no choice but to separate from Defendants on December 3, 2019.

### FIRST CLAIM FOR RELIEF
Premises Liability Act, C.R.S. § 13-21-115

80. Plaintiff incorporates all allegations in this pleading into this claim for relief.

81. Defendant Devereux Cleo Wallace is a landowner under C.R.S. § 13-21-115 because it owns, operates, and possesses the property located at 8405 Church Ranch Boulevard, Westminster, Colorado 80021.

82. Because Defendants Devereux Advanced Behavioral Health and Devereux Foundation Texas own and operate Defendant Devereux Cleo Wallace, they are also landowners under C.R.S. § 13-21-115.

83. Plaintiff was an invitee to Defendants' property at 8405 Church Ranch Boulevard, Westminster, Colorado 80021 according to C.R.S. § 13-21-115(5)(a).

84. Defendants unreasonably failed to exercise reasonable care to protect Plaintiff from the danger they knew or should have known that the Patient posed to staff or other patients.

85. Because Defendants unreasonably failed to exercise reasonable care with respect to Plaintiff, she suffered damages.

## SECOND CLAIM FOR RELIEF
Negligence

86. Plaintiff incorporates all allegations in this pleading into this claim for relief.

87. Defendants owed Plaintiff a duty of reasonable care.

88. By their acts and omissions, Defendants breached the duty of reasonable care, including failing to warn Plaintiff about the danger the Patient posed to her and having office doors that automatically locked when closed.

89. As a result of Defendants' breach of their duty of care, Defendants harmed Plaintiff and caused her damages.

## THIRD CLAIM FOR RELIEF
Sexually Hostile Work Environment
Title VII, 42 U.S.C. § 2000e *et seq.*

90. Plaintiff incorporates all allegations in this pleading into this claim for relief.

91. Defendants were employers and Plaintiff was Defendants' employee within the meaning of Title VII.

92. Defendants subjected Plaintiff to an unwelcome and offensive sexually harassing hostile work environment during her employment.

93. Defendants subjected Plaintiff to this environment because of her sex.

94. Defendants created, condoned, and failed to take reasonable care to prevent or correct this hostile work environment.

95. Defendants did not put in place policies to prevent this hostile work environment or did not follow its own policies.

96. Plaintiff attempted to take advantage of any preventative and corrective opportunities and policies provided by Defendants in order to avoid the harms described herein.

97. Because of Defendants' actions and inactions, Plaintiff experienced damages.

## FOURTH CLAIM FOR RELIEF
Retaliation
Title VII, 42 U.S.C. § 2000e *et seq.*

98. Plaintiff incorporates all allegations in this pleading into this claim for relief.

99. Defendants were employers and Plaintiff was Defendants' employee within the meaning of Title VII.

100. Plaintiff made numerous complaints about a sexually harassing hostile work environment to Defendants, including her sexual assault complaint on December 12, 2018.

101. As a result, Plaintiff was subjected to an ever-increasing hostile work environment.

102. Defendants' retaliatory actions caused Plaintiff to constructively discharge from her employment.

103. Defendants actions described herein were intentional, and taken with malice and with reckless indifference to Plaintiff's protected rights.

104. Plaintiff attempted to take advantage of any preventive and corrective opportunities and policies provided by Defendants in order to avoid the harms described herein.

105. Because of Defendants' actions and inactions, Plaintiff suffered damages.

## REQUESTED RELIEF

Plaintiff respectfully asks the Court to enter judgment in her favor and against Defendants in an amount to be determined at trial, and award her all relief allowed by law, including, but not limited to:

A. Economic losses;

B. Compensatory damages, including damages for emotional distress, humiliation, impairment of quality of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

C. Attorneys' fees and the costs of bringing this action, including expert witness fees, on all claims allowed by law;

D. Pre-judgment and post-judgment interest at the appropriate lawful rate;

E. Declaratory and injunctive relief; and

F. Any other relief justice requires and law or equity allows.

## JURY DEMAND

Plaintiff demands a jury trial on all issues for which she is entitled to one.

Submitted this 1st day of December, 2020.

**LOWREY PARADY LEBSACK, LLC**

/s/*Mary Jo Lowrey*_____
Mary Jo Lowrey, No. 40411
Sara N. Maeglin, No. 49943
*Attorneys for Plaintiff*

Plaintiff's Address:

2445 Windrow Drive
#B304
Fort Collins, CO 80525

13